STATE of Missouri, Respondent,

v.

Marlon MARTIN, Appellant.

No. WD 52258.

Missouri Court of Appeals,
Western District.

Submitted Oct. 10, 1996.

Decided Feb. 11, 1997.

Rebecca L. Kurz, Asst. Appellate Defender, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Joanne E. Joiner, Asst. Atty. Gen., Jefferson City, for respondent.

Before SMART, P.J., and SPINDEN and ELLIS, JJ.

SMART, Presiding Judge.

Marlon Martin appeals from the trial court's judgment finding him guilty of aggra-

vated stalking, in violation of § 565.225.3, RSMo 1994.[1] Martin was sentenced to fifty-four months imprisonment. On appeal, Martin claims that (1) insufficient evidence was presented to support the conviction, and (2) the record does not reflect with unmistakable clarity that Martin waived his right to a jury trial.

Judgment is affirmed.

On February 23, 1995, Marlon Martin was charged by information of the class D felony of aggravated stalking, in violation of § 565.225.3:

> [I]n that between December 1, 1994 and January 30, 1995, in the county of Jackson, State of Missouri, the defendant repeatedly and purposely harassed Nida Wilson by making numerous threatening phone calls to her and thereby caused substantial emotional distress to Nida Wilson and made a credible threat, by stating that he had a bullet for her, with the intent of placing her in reasonable fear of death or serious physical injury.

The information was amended on December 18, 1995, charging Martin as a prior offender. Martin pleaded not guilty and the case went to trial on December 19, 1995.

We view the evidence in the light most favorable to the verdict. *State v. Silvey*, 894 S.W.2d 662, 673 (Mo. banc 1995). Nida Wilson and Martin met in 1988 and began dating soon thereafter. In September, 1989, Ms. Wilson and Martin had a child, Mark Martin. Ms. Wilson also had two other sons with different fathers. In 1990, the couple began living together. Martin went to prison for a time in 1990, and sometime after Martin's release, they resumed living together, and began dating each other exclusively for the first time.

There were several incidents of physical abuse over the next couple of years by Martin against Ms. Wilson. Once, after arguing over a former girlfriend of Martin's, Martin hit Ms. Wilson in the nose, knocking her down onto her bed and causing her nose to bleed. In another incident, Martin hit Ms. Wilson above her right eye, causing it to

bleed. Martin once held a knife to Ms. Wilson's throat and threatened to kill her.

In 1994, the relationship had substantially deteriorated and Ms. Wilson obtained ex-parte orders of protection. Martin called Ms. Wilson on the phone and told her that a piece of paper was not going to protect her. Shortly after the call, Martin kicked Ms. Wilson's front door down, pushed her onto the stairs, grabbed her around the neck and began choking her. On another occasion, Martin became very angry after a phone call and he hit Ms. Wilson in the face with his fist, stating that she was to blame for the way his life had turned out. The beating continued for four or five hours. Ms. Wilson went to the hospital and eventually moved into a battered women's shelter, Hope House. Eventually, Martin obtained the number to Hope House from his sister. He began to call Ms. Wilson, trying to reconcile their relationship. This went on for several months.

In January, 1995, the telephone calls started to take a different direction. Martin screamed at her and threatened to kill her and her family. This happened on more than one occasion. The phone number at Hope House had to be changed as a result of the phone calls. After receiving the threatening phone calls, Ms. Wilson had trouble eating and sleeping. She was afraid to drive her car for fear she would encounter Martin. She would only occasionally drive her children to school, and when she did, she was constantly checking her mirrors for signs of Martin. On January 30, 1995, she went to the police because she had a tape of threatening messages Martin had left on her answering machine. On the tape-recorded messages, Martin screamed and frequently used profanity. Martin repeatedly threatened to kill Ms. Wilson, her parents and her children on the taped messages.

At the time of trial, Ms. Wilson still lived at Hope House and had no contact with Martin. She was in counseling once a week. Ms. Wilson testified that prior to the messages on the tape, Martin had never screamed at her with the same level of intensity. Detective Martin Kavanah interviewed

---

1. All statutory references are to Missouri Revised Statutes 1994, unless otherwise indicated.

Martin and Martin admitted that he had called Ms. Wilson and threatened to kill her. Martin called several witnesses in his defense and also testified himself. Martin testified that he made the threatening phone calls to Ms. Wilson because he had wanted her to feel the pain that he had felt because she had told him that his child was not really his. He also stated that making the threatening phone calls allowed him to vent his anger and that he never intended to follow through on the threats. He admitted having been physically violent with Ms. Wilson and that he had struck her, punched her, choked her, held a knife to her throat, and slapped her once or twice. He also testified that it was reasonable for Ms. Wilson to believe that he could become violent. At the end of the trial, Martin was found guilty as charged and was sentenced to fifty-four months imprisonment. Martin appeals.

### *"Substantial Emotional Distress"*

■ In Point I, Martin claims that the trial court erred in denying Martin's motion for judgment of acquittal because the state failed to prove Martin's guilt beyond a reasonable doubt, in violation of his right to due process of law, as guaranteed by the fifth and fourteenth amendments to the United States Constitution and Article I, § 10 of the Missouri Constitution. Specifically, Martin claims that the state failed to establish that Martin's conduct actually caused Nida Wilson to experience "substantial emotional distress."

In addressing a challenge to the sufficiency of the evidence presented to support a conviction, this court views the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the verdict, ignoring contrary evidence. *State v. Grim,* 854 S.W.2d 403, 405 (Mo. banc), *cert. denied,* 510 U.S. 997, 114 S.Ct. 562, 126 L.Ed.2d 462 (1993). This court's function is not to reweigh the evidence, but to determine whether the evidence was sufficient to support the verdict. *State v. Williams,* 623 S.W.2d 552, 553 (Mo.1981).

Martin was convicted of one count of aggravated stalking in violation of § 565.225.3 for making repeated threatening phone calls to Nida Wilson. Section 565.225.3 provides: "Any person who purposely and repeatedly harasses or follows with the intent of harassing or harasses another person, and makes a credible threat with the intent to place that person in reasonable fear of death or serious physical injury, commits the crime of aggravated stalking." Section 565.225.1(3) defines the term "harasses" to mean "to engage in a course of conduct directed at a specific person that serves no legitimate purpose, that would cause a reasonable person to suffer substantial emotional distress, and that actually causes substantial emotional distress to that person."

The term "substantial emotional distress" is not defined in § 565.225. Martin suggests that the term "substantial emotional distress" has the same meaning as the term "serious emotional injury," defined in § 556.061(27). "Serious emotional injury" is defined in § 556.061(27) to mean:

> [A]n injury that creates a substantial risk of temporary or permanent medical or psychological damage, manifested by impairment of a behavioral, cognitive or physical condition. "Serious emotional injury" shall be established by testimony of qualified experts upon the reasonable expectation of probable harm to a reasonable degree of medical or psychological certainty.

Under § 556.061(27), proof of "serious emotional injury" requires expert medical or psychological testimony. Martin asserts that the evidence was insufficient to support the conviction for stalking because no expert medical or psychological testimony was presented to show that Ms. Wilson suffered "substantial emotional distress."

Citing *Childs v. Williams,* 825 S.W.2d 4, 10 (Mo.App.1992), Martin argues that the terms "serious emotional injury" and "substantial emotional distress" are used interchangeably in Missouri case law. *Childs* is a civil case involving an action by an employee who was demoted after her treating psychologist sent a letter to her supervisor urging that she be transferred to a less stressful position. *Childs,* 825 S.W.2d at 7. The employee filed suit against the psychologist for intentional infliction of emotional distress and invasion of privacy. *Id.* at 5–6. In the court's discus-

sion, it stated that to prove a claim for intentional infliction of emotional distress, where there has been no physical injury, medical expert testimony is required to prove the "emotional distress or mental injury." *Id.* at 10. Martin argues that expert medical testimony is required in this case as well.

We turn to the language of § 565.225 to determine the meaning of the term "substantial emotional distress." The cardinal rule of statutory construction is to determine the intent of the legislature from the wording of the statute and to give effect to that intent, if possible. *State v. Reynolds,* 819 S.W.2d 322, 329 (Mo. banc 1991)(Holstein, J., concurring in part and dissenting in part). In determining the intent of the legislature, we must consider the plain and ordinary meaning of the words used in the statute. *State v. Wahby,* 775 S.W.2d 147, 151 (Mo. banc 1989). The common meaning of the word "substantial" is "not seeming or imaginary; not illusive; real, true; considerable in amount, value or worth." Webster's New Third International Dictionary 2280 (1971). We conclude the legislature did not intend to use the definition of "serious emotional injury," defined in § 556.061(27), as the meaning for "substantial emotional distress" provided in § 565.225. If the legislature had intended such a meaning, it could have referred to § 556.061(27) specifically, or could have used the same phrase in the statute. The legislature chose not to define the term "substantial emotional distress." The fact finder is thus to apply these terms in their commonly understood meaning. The words have commonly understood meanings that a person of average intelligence can understand without recourse to legislative definition. *See State v. Martel,* 273 Mont. 143, 902 P.2d 14, 19 (1995). Martin fails to show that the court must require a victim of stalking to present medical evidence to prove the victim suffered "substantial emotional distress," when there is substantial credible evidence from other sources to support such a finding.

In this case, there is abundant evidence that Ms. Wilson suffered "substantial emotional distress," as a result of receiving numerous threatening phone calls. Martin left numerous vulgar and threatening messages for Ms. Wilson. He threatened repeatedly to kill Ms. Wilson, to kill Ms. Wilson's parents and to kill Ms. Wilson's children. He screamed and used obscenities during the phone messages. Ms. Wilson also knew Martin had a propensity for violence and that he had a very bad temper. She demonstrated her actual fear for her life by moving out of her home and into Hope House for several months to avoid contact with Martin. The testimony shows she was unable to eat or sleep. She was so afraid she rarely left Hope House. On the few occasions when she drove her children to school, she was taut with fear of running into Martin. She sought and obtained counseling to deal with the stress. This is not a case where we have only the victim's bare assertion that she found his actions distressing. This evidence was sufficient for a reasonable fact finder to find that Ms. Wilson suffered "substantial emotional distress" from Martin's actions. The trial court did not err in denying Martin's motion for judgment of acquittal.

### Waiver of Jury Trial

In Point II, Martin claims that the trial court plainly erred in failing to ascertain on the record whether Martin knowingly, intelligently and voluntarily waived his right to a trial by jury, in violation of Missouri Supreme Court Rule 27.01(b). Martin claims his rights to a jury trial and due process of law, as guaranteed by the fifth and fourteenth amendments to the United states Constitution and Article I, §§ 10, 18(a) and 22(a) of the Missouri Constitution, were violated, because the record does not reflect with unmistakable clarity an affirmative waiver by Martin of his right to a jury trial.

Martin concedes that he failed to present this allegation of error to the trial court during trial or in a motion for new trial. Martin raises this issue for the first time on appeal. The alleged error has not been properly preserved for appellate review. *State v. Nave,* 694 S.W.2d 729, 734 (Mo. banc 1985), *cert. denied,* 475 U.S. 1098, 106 S.Ct. 1500, 89 L.Ed.2d 901 (1986). This court de-

clines Martin's request for plain error review of this point because he has failed to show that a manifest injustice or miscarriage of justice has resulted. Rule 84.13(c). Failure to raise the issue sooner in the proceedings is tantamount to waiver of appellate review.

Judgment is affirmed.

SPINDEN and ELLIS, JJ., concur.

